**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

RAJUL RUHBAYAN, a/k/a Creme, a/k/a
Kreem, a/k/a Day-Ja, a/k/a Deja,
a/k/a Amir Ruhbayan, a/k/a Jibra'el          No. 02-4331
Ruh-alamin, a/k/a Jibrael
Ruhalamin, a/k/a James Vernon
Wood, a/k/a James Vernette
Johnson,
             *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca Beach Smith, District Judge.
(CR-02-29)

Argued: January 21, 2003

Decided: April 7, 2003

Before KING, Circuit Judge, HAMILTON, Senior Circuit Judge,
and Morton I. GREENBERG, Senior Circuit Judge of the
United States Court of Appeals for the Third Circuit,
sitting by designation.

Affirmed by published opinion. Judge King wrote the opinion, in
which Senior Judge Hamilton and Senior Judge Greenberg joined.

**COUNSEL**

**ARGUED:** Joseph Barry McCracken, COOK & MCCRACKEN, Norfolk, Virginia, for Appellant. James Ashford Metcalfe, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Norfolk, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Rajul Ruhbayan appeals from the district court's refusal to dismiss charges of perjury and subornation of perjury levied against him by a grand jury in the Eastern District of Virginia. Ruhbayan maintains that, because of a favorable jury verdict rendered in an earlier prosecution, those charges are barred by the doctrine of collateral estoppel. As explained below, we reject Ruhbayan's collateral estoppel claim and affirm the decision of the district court.

I.

On August 25, 2000, Ruhbayan was indicted in the Eastern District of Virginia for multiple felonies, including being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (the "Firearms Charge"), and related drug-trafficking offenses. In September of 2000, Ruhbayan was tried by a jury in Norfolk, Virginia (the "First Trial"). During the First Trial, the prosecution presented several witnesses, including police officers, who testified that Ruhbayan had been involved in drug-trafficking and firearms activities. On the Firearms Charge, officers testified about their search of Ruhbayan's van on the morning of April 14, 2000. During the search, the police found a loaded nine-millimeter pistol (the "pistol") hidden between cushions of the van's back seat.

Ruhbayan testified in the First Trial, admitting that he was a convicted felon, but denying that he was a drug dealer or that he had possessed the pistol. He specifically denied knowing the pistol was in his

van on April 14, 2000. In his defense, Ruhbayan also called Yolanda Goodman, who testified that she was his girlfriend, that she had often been to his home, and that she had never seen him with either drugs or firearms. Most importantly, she asserted that, without Ruhbayan's knowledge, she had placed the pistol in his van on April 14, 2000. The jury found Ruhbayan guilty of two lesser-included misdemeanor offenses, simple possession and conspiracy to possess crack cocaine, but acquitted him of the remaining charges, including the Firearms Charge.

Following the First Trial, Goodman was indicted for a federal firearms offense relating to the pistol. Her indictment, for violating 18 U.S.C. § 922(g)(1), was premised on her admissions in the First Trial that she (1) possessed the pistol, and (2) was a convicted felon. After her indictment, Goodman's lawyer advised the United States Attorney that, contrary to her trial testimony, Goodman had nothing to do with the pistol. Instead, she claimed to have testified falsely to assist Ruhbayan's defense. Goodman then agreed to plead guilty to an information charging obstruction of justice and, *inter alia*, to cooperate with the prosecutors, in exchange for the dismissal of her indictment. In her plea agreement, Goodman stipulated that:

> On September 1, 2000, in the United States District Court . . . Defendant GOODMAN testified falsely that she had possessed the firearm and ammunition and that she had placed them in Ruhbayan's vehicle without his knowledge on or about April 14, 2000, in Suffolk, Virginia, when she knew in fact that she had never possessed the firearm and ammunition, had never placed them in Ruhbayan's vehicle, and was testifying falsely as requested by the defendant Ruhbayan in order to assist him in misleading the jury in order to obtain an acquittal on Ruhbayan's pending firearms charges.

Goodman provided the Government with more than fifty letters that Ruhbayan had written to her while he was in custody awaiting the First Trial (the "Ruhbayan Letters"). The Ruhbayan Letters corroborate Goodman's obstruction of justice plea and provide compelling evidence that Ruhbayan had concocted a scheme to offer false testimony in his First Trial.

In the Ruhbayan Letters, Ruhbayan repeatedly asked Goodman to find a non-felon who would admit to placing the pistol in his van, without his knowledge, on or before April 14, 2000. When Goodman was unsuccessful in locating such an individual, Ruhbayan convinced her to testify that it was she who placed the pistol in his van. In his letters, Ruhbayan laid out a "roadmap" for her to follow, writing that she should contact his lawyer and say that she had placed the pistol in the van about 3:00 a.m. on April 14, 2000. She should add, Ruhbayan wrote, that she had planned to retrieve the pistol around 5:00 a.m., but that Ruhbayan was arrested before she could do so. Ruhbayan promised not to "cross up" Goodman when he testified. (Goodman's recantation and the Ruhbayan Letters are referred to collectively as the "Goodman Evidence.")

On the basis of the Goodman Evidence, a grand jury, on February 12, 2002, returned a five-count indictment against Ruhbayan (the "Indictment"). In the Indictment, Ruhbayan was charged with: (1) conspiracy to commit perjury and obstruct justice; (2) corruptly influencing the testimony of a witness; (3) perjury, in violation of 18 U.S.C. § 1623 (the "Perjury Charge"); (4) suborning Goodman's perjury, in contravention of 18 U.S.C. § 1622 (the "Subornation Charge"); and (5) obstructing justice. Ruhbayan sought dismissal of the Indictment on collateral estoppel grounds, contending that all five counts were barred by his acquittal on the Firearms Charge in his First Trial. The district court refused to dismiss the Indictment, however, concluding that the doctrine of collateral estoppel was inapplicable to Ruhbayan's situation. Ruhbayan has appealed, challenging the court's refusal to dismiss the Perjury Charge and the Subornation Charge.[1] We possess jurisdiction pursuant to 28 U.S.C. § 1291, because the denial of Ruhbayan's motion to dismiss constitutes an appealable final order under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949).[2]

---

[1]On appeal, Ruhbayan initially contended that all five counts of the Indictment were barred by collateral estoppel. At oral argument, however, he narrowed the scope of his appeal, challenging only the Perjury Charge and the Subornation Charge.

[2]*See Abney v. United States*, 431 U.S. 651, 659 (1977) (holding that order denying pretrial motion to dismiss indictment on grounds of double

## II.

We review de novo a district court's refusal to dismiss an indictment assertedly barred by collateral estoppel. *United States v. Fiel*, 35 F.3d 997, 1005 (4th Cir. 1994). Findings of fact made by a district court in connection with such a ruling are reviewed for clear error. *See United States v. Ward*, 171 F.3d 188, 193 (4th Cir. 1999).

## III.

### A.

For criminal purposes, the doctrine of collateral estoppel derives from the Fifth Amendment's guarantee against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 445 (1970). As the Court explained in *Ashe*, "[w]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443. Similarly, as we have held previously, "[d]ouble jeopardy is a constitutional bar not only to retrial for the same offense, but also to relitigation of adjudicated issues whether they emerge in trials for the same or distinct offenses." *United States v. Nash*, 447 F.2d 1382, 1385 (4th Cir. 1971). Although the doctrine of collateral estoppel was first developed in the realm of civil litigation, it now constitutes a fixed principle of federal criminal law. *See United States v. Oppenheimer*, 242 U.S. 85, 87 (1916) ("It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt."). Collateral estoppel is not to be applied mechanically, however, but only with "realism and rationality." *Ashe*, 397 U.S. at 444.

While the doctrine of collateral estoppel is constitutionally based and will, in proper circumstances, constitute a bar to a criminal trial,

---

jeopardy is final order for purposes of 28 U.S.C. § 1291); *see also United States v. James*, 109 F.3d 597, 599 (9th Cir. 1997) ("The denial of a motion to dismiss an indictment on . . . collateral estoppel grounds is [an appealable] final order."); *United States v. Smith*, 82 F.3d 1261, 1265-66 (3d Cir. 1996) (same); *United States v. Patterson*, 782 F.2d 68, 72 (7th Cir. 1986) (same).

a criminal defendant's right to testify in his own defense "does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). Thus, an acquittal does not constitute an automatic bar to a subsequent prosecution for perjury committed during the earlier trial. As the Ninth Circuit has aptly observed, "[t]o hold otherwise . . . would be to put a premium on perjury and to make immunity from punishment for perjury rest on success in commission of the crime." *United States v. Sarno*, 596 F.2d 404, 407 (9th Cir. 1979) (internal quotation marks and citations omitted).

In our 1994 *Fiel* decision, Chief Judge Ervin identified the five elements relevant to a collateral estoppel claim (the "*Fiel* test"). They are:

> (1)    whether the issue in question is identical to the issue adjudicated in a prior proceeding;

> (2)    whether the issue was actually determined in the prior adjudication;

> (3)    whether the issue was necessarily decided in that proceeding;

> (4)    whether the resulting judgment settling the issue was final and valid; and

> (5)    whether the parties had a full and fair opportunity to litigate the issue in the prior proceeding.

*Fiel*, 35 F.3d at 1006. In order for a criminal prosecution to be barred by collateral estoppel under the *Fiel* test, each of these five elements must be resolved in the movant's favor. In seeking relief here, Ruhbayan contends that the *Fiel* test is satisfied and that our decision in *Nash* is factually indistinguishable from his case.

In assessing a collateral estoppel claim, a reviewing court is obliged to "'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict

upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Fiel*, 35 F.3d at 1006 (quoting *Ashe*, 397 U.S. at 444). In conducting its examination, the court's inquiry must be "set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon v. United States*, 332 U.S. 575, 579 (1948). With this background in mind, we turn to the merits of Ruhbayan's appeal.

## B.

## 1.

In assessing the Perjury Charge,[3] we begin by observing that the first and fourth elements of the *Fiel* test are satisfied, that is, the issue at stake in the two proceedings is identical and the judgment in the first proceeding was final and valid. The issue to be resolved in the Perjury Charge is whether Ruhbayan testified falsely in the First Trial regarding his knowledge of the pistol in his van (the "Issue"). The Issue was implicitly presented to the jury in the First Trial, in that the defense presented the jury with Ruhbayan's denial of knowledge of the pistol as a basis for acquittal on the Firearm Charge. Thus, the *Fiel* test's first element is satisfied. The fourth element of the *Fiel* test is also satisfied, because the First Trial resulted in a final and valid judgment of acquittal on the Firearms Charge. The other three elements of the *Fiel* test are not so easily resolved, however, and they require more comprehensive analyses.

---

[3]The Perjury Charge, set forth in Count Three of the Indictment, alleges that:

> On or about September 1, 2000, in the United States District Court at Norfolk, Virginia, in the Eastern District of Virginia, the defendant RAJUL RUHBAYAN, while under oath that he would testify, declare, depose, or certify truly, as authorized by the laws of the United States, in a jury trial proceeding before the court entitled *United States v. RAJUL RUHBAYAN*, Criminal Number 2:00 CR 86, did knowingly make a false material declaration.

2.

We turn then, to a joint assessment of the second and third elements of the *Fiel* test, that is, whether the First Trial "actually" and "necessarily" determined the truthfulness of Ruhbayan's testimony. The appropriate inquiry on each of these elements involves an analysis of whether the jury, in reaching its verdict on the Firearms Charge, credited Ruhbayan's testimony, or whether it could have reached its verdict by relying either on some other piece of evidence or some latent deficiency in the prosecution's case. *See Nash*, 447 F.2d at 1385.

While Ruhbayan invokes *Nash* for the proposition that his acquittal on the Firearms Charge bars his perjury prosecution, the factual underpinnings of *Nash* are materially different from those underlying the Perjury Charge. After being acquitted of mail theft, Nash was convicted of perjury with respect to testimony she gave in the earlier trial. *Nash*, 447 F.2d at 1383. In that situation, Nash had contended that the perjury charge was barred by collateral estoppel because the prosecution was based on the same evidence as that underlying her mail theft prosecution. According to Nash, the perjury case amounted to a mere retrial of her earlier mail theft charge. We agreed with Nash, concluding:

> The jury in the first case undoubtedly passed upon the believability of Estelle Nash's statements made under oath. The jury may have been in error, but certainly it appraised the defendant's credibility. It is inconceivable that there would have been an acquittal if the jury had not accorded truth to her testimony.

*Id.* at 1385. Indeed, we noted that there "were but two conflicting explanations of her possession to be considered [Nash's and the Government's version]. Thus, the jury "necessarily" had to pass upon the truthfulness of her account."[4] *Id.*

---

[4]When *Nash* was decided in 1974, the *Fiel* test, enunciated in 1994, was not available for the *Nash* court to consider. Our analysis of the *Nash* case indicates, however, that an application of the *Fiel* test to the facts of *Nash* would have yielded the same result.

Unlike the situation in *Nash*, the jury in the First Trial did not necessarily credit or rely on Ruhbayan's testimony in deciding to acquit. In his testimony, Ruhbayan simply denied everything and accused the prosecution witnesses of lying. By contrast, Goodman presented detailed evidence, describing her purchase of the pistol, the reasons for the purchase, how she had concealed the pistol in the van, and why she chose to withhold these facts from Ruhbayan. In light of this testimony, it is not only possible, but altogether likely that the verdict in the First Trial was premised on Goodman's testimony, rather than on Ruhbayan's summary denials. In this situation, the jury could have simply ignored Ruhbayan's testimony, making it impossible for us to determine whether the jury passed on his credibility. As the Third Circuit has observed in a similar setting, "[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel." *Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970). The district court therefore correctly concluded that Ruhbayan failed to establish that the Issue in the Perjury Charge was necessarily decided in the First Trial.

### 3.

Turning to the final element of *Fiel*, even if Ruhbayan could establish that the Issue was actually and necessarily decided in the First Trial, he could not show that the Government was afforded, in the First Trial, a full and fair opportunity to litigate the truthfulness of Ruhbayan's testimony. In assessing this element of the *Fiel* test, the Double Jeopardy Clause precludes the Government from simply trying a defendant a second time, and thereby recovering "from its initial failure to convince the [jury] of the falsity of defendant's testimony at the first trial." *Sarno*, 596 F.2d at 407. Thus, when a perjury indictment is premised on the same evidence presented in an earlier trial, a second trial for perjury is an inappropriate "rehash" of the first trial. *Cf. Nash*, 447 F.2d at 1387 (Winter, J., concurring) ("In this case, we obtained transcripts of both trials after argument. My comparisons of them discloses that, at the trial for perjury, the evidence was a mere *rehash* of the evidence adduced at the first trial.") (emphasis added); *see also Sarno*, 596 F.2d at 407 ("[A] rehashing of evidence previously presented would clearly be prohibited by the collateral estoppel doctrine."). By the same token, if the second trial, involving an already litigated issue, will be substantially more than a "mere rehash"

— because of evidence unavailable and undiscoverable prior to the earlier trial — the Government has not been afforded a full and fair opportunity to litigate the issue. Under those circumstances, the application of collateral estoppel would not be appropriate.

In the circumstances of this case, the Government was denied a full and fair opportunity to litigate Ruhbayan's credibility in the First Trial. His defense to the Firearms Charge — that is, the false exculpatory evidence composed of Ruhbayan's and Goodman's testimony — resulted in his acquittal. His scheme to commit perjury was then known only to Ruhbayan and Goodman, and the scheme was successfully concealed until Goodman disclosed it to the Government following her plea agreement. Furthermore, no amount of diligence would have uncovered Ruhbayan's scheme to deceive the jury in the First Trial.

Given the surfacing of the new, previously unavailable Goodman Evidence, Ruhbayan's prosecution on the Perjury Charge will not constitute a mere rehash of the Firearms Charge. In this prosecution, the Government will use Goodman's testimony to show that Ruhbayan requested that she testify falsely about the pistol. Additionally, the Ruhbayan Letters will be compelling corroborative evidence supporting Goodman's present credibility and showing that Ruhbayan is likely to have lied in his First Trial. As the district court concluded, "the truth of [Ruhbayan and Goodman's testimony] could not have been determined properly [because] the jury did not have all of the information in front of it." In these circumstances, the fifth element of *Fiel* has not been satisfied.

4.

Because three of *Fiel*'s five elements are not satisfied, the doctrine of collateral estoppel does not bar the prosecution of Ruhbayan on the Perjury Charge. His claim that the Perjury Charge should be dismissed must therefore be rejected. We turn now to assess whether the Government is barred from prosecuting Ruhbayan on the Subornation Charge.

## C.

The Subornation Charge alleges that Ruhbayan procured Goodman's false testimony in the First Trial.[5] Therefore, on the collateral estoppel claim as to the Subornation Charge, none of the elements of the *Fiel* test is satisfied. The trial of the Subornation Charge will focus on Ruhbayan's corrupt efforts to procure Goodman's false testimony, and those efforts were neither raised nor litigated in the First Trial. That the issue of Ruhbayan's having procured false testimony was neither presented nor considered in the First Trial quickly disposes of the *Fiel* test's five elements. *See Nash*, 447 F.2d at 1385. Accordingly, the doctrine of collateral estoppel does not bar the prosecution of the Subornation Charge.

## IV.

Pursuant to the foregoing, the doctrine of collateral estoppel does not bar the Government from prosecuting Ruhbayan for perjury and subornation of perjury, as charged in the Indictment. We therefore affirm the decision of the district court.

*AFFIRMED*

---

[5]The Subornation Charge, set forth in Count Four of the Indictment, alleges as follows:

> On or about September 1, 2000, in the United States District Court at Norfolk, Virginia, in the Eastern District of Virginia, the defendant RAJUL RUHBAYAN, did knowingly and corruptly procure another person, namely Yolanda Goodman, to commit perjury, knowing, believing, and having reason to believe it to be false testimony, and knowing, believing, and having reason to believe that the perjurer had knowledge of the falsity of her testimony in a jury trial proceeding before the court entitled *United States v. RAJUL RUHBAYAN*, Criminal Number 2:00 CR 86.